James JOHNSON, Plaintiff-Respondent,

v.

MISERICORDIA COMMUNITY HOSPITAL and Employers Mutual Liability Insurance Company of Wisconsin, Defendants-Appellants-Petitioners.

Supreme Court

*No. 79–696. Argued November 24, 1980.—
Decided January 6, 1981.*

(Also reported in 301 N.W.2d 156.)

For the petitioners there were briefs by *Law Offices C. Donald Straub* and oral argument by *C. Donald Straub* of Milwaukee.

For the respondent there was a brief by *Gerald J. Bloch* and *Phillips & Bloch, S. C.,* of Milwaukee, and oral argument by *Gerald J. Bloch.*

COFFEY, J. This is a review of a decision of the court of appeals[1] affirming a judgment of the circuit court for Milwaukee County, the HON. JOHN E. Mc-CORMICK presiding. Judgment was entered in favor of the plaintiff-respondent, James Johnson, pursuant to a jury verdict finding the defendant-petitioner, Misericordia Community Hospital (Misericordia), Milwaukee, negligent in granting orthopedic surgical privileges to Dr. Lester V. Salinsky.

This action arose out of a surgical procedure performed at Misericordia by Dr. Salinsky on July 11, 1975,

---

[1] The decision of the Court of Appeals is reported at 97 Wis.2d 521, 294 N.W.2d 501 (Ct. App. 1980).

in which he unsuccessfully attempted to remove a pin fragment[2] from Johnson's right hip. During the course of this surgery, the plaintiff's common femoral nerve and artery were damaged causing a permanent paralytic condition of his right thigh muscles with resultant atrophy and weakness and loss of function.

About fifteen months thereafter, on October 13, 1976, the plaintiff filed suit alleging that both Dr. Salinsky and Misericordia Community Hospital[3] were negligent. The hospital was negligent:

"(a) by being imprudent and careless in its selection of Lester V. Salinsky as a member of its staff;

"(b) in allowing Lester V. Salinsky to perform orthopedic surgery within its operative facilities when it knew, or should have known, that Lester V. Salinsky was not qualified to perform such diagnostic and operative procedures;

"(c) in failing to investigate the abilities and qualities of Lester V. Salinsky's capabilities in orthopedic care when said hospital knew, or should have known, that he did not possess such proper capability."

Prior to trial, Salinsky and his insurance carrier settled with the plaintiff and were released from the suit with a *Pierringer*[4] type release upon payment of $140,-000. Although Salinsky was no longer a party to the action, the question of whether he was negligent in the manner in which he performed the operation on July 11,

---

[2] In 1969 Dr. Salinsky inserted two "Knowles" pins into Johnson's right hip in an attempt to correct a condition known as capitofemoral epiphysis. Subsequently, in 1970, Salinsky attempted to remove both pins but one fragmented in the process and thus a portion of the pin was left in the plaintiff's hip.

[3] An amended complaint was filed on December 6, 1976, in which the plaintiff joined Aetna Casualty & Surety Co. and Employers Mutual Liability Insurance Co. of Wisconsin as the liability insurers of Salinsky and Misericordia, respectively.

[4] *See: Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (1963).

1975, remained an issue at trial, as it was incumbent upon the plaintiff to prove that Salinsky was negligent in this respect to establish a causal relation between the hospital's alleged negligence in granting Salinsky orthopedic surgical privileges and Johnson's injuries.[5] Further, a determination of Salinsky's causal negligence, if any, was necessary to accomplish a proper allocation of the causal negligence between the two alleged joint tortfeasors, Salinsky and Misericordia.[6]

At trial, undisputed expert testimony established that the surgical procedure utilized by Salinsky in attempting to remove the pin fragment from Johnson's right hip at Misericordia in July of 1975, was not in accord with good orthopedic practice. Accordingly, the jury found that Salinsky was negligent with respect to the medical care and treatment he afforded the plaintiff and attributed twenty percent of the causal negligence to him and eighty percent to the hospital. The jury's finding of negligence on the part of Salinsky has not been challenged on appeal and thus the facts relating thereto are not at issue in this review. Therefore, the only facts material to this review are those connected with Misericordia Hospital in appointing Dr. Salinsky to the medical staff with orthopedic privileges.

The record establishes that Misericordia was formerly known as Misericordia Hospital and operated by the Sisters of Misericordia. In 1969, the Sisters sold the hospital to Drs. John Bryant, Louis Maxey and John Terry who transformed it into a nursing home known as Downtown Nursing Home, Inc. Subsequently, in January of 1971, the Board of Directors reinstituted hospital services at the facility as a state licensed general hospital[7]

[5] *See:* Annot., 51 ALR3d 981, 983–84 (1973).

[6] *See: Pierringer v. Hoger, supra* n. 4 at 192.

[7] A "general hospital" is ". . . a hospital providing community service for inpatient medical and surgical care of acute illness or injury and/or for obstetrics." Wis. Adm. Code H 24.01(4)(b)1.

and changed the corporate name to Wisconsin Hospital and Geriatric Treatment Center. During the fall of 1972, all of the nursing home services were discontinued and the name "Misericordia Community Hospital" was adopted. The hospital known as Misericordia Community Hospital was not and has not been accredited by the Joint Commission on Accreditation of Hospitals.[8]

On March 5, 1973, shortly after Misericordia Community Hospital returned to the status of a general hospital, Dr. Salinsky applied for orthopedic privileges on the medical staff. In his application, Salinsky stated that he was on the active medical staff of Doctors Hospital (Family Hospital), with orthopedic privileges, and held consultant privileges at Northwest General Hospital and New Berlin Community Hospital. He further stated in the application that his privileges at other hospitals had never "been suspended, diminished, revoked, or not renewed." In another part of the application form, he failed to answer any of the questions pertaining to his malpractice insurance, *i.e.*, carrier, policy number, amount of coverage, expiration date, agent, and represented that he had requested privileges only for those surgical procedures in which he was qualified by certification.

---

[8] The Joint Commission on Accreditation of Hospitals (JCAH) was organized in 1952 by the American Hospital Association, American Medical Association, American College of Physicians, American College of Surgeons, and Canadian Hospital Association. Its purpose was to establish minimum hospital standards for patient care. Requests for a survey for accreditation purposes are voluntary, but since internship and residency programs as well as participation in the federal Medicare and Medicaid programs are often contingent upon JCAH approval, most hospitals seek JCAH accreditation. Copeland, *Hospital Responsibility for Basic Care Provided by Medical Staff Members." Am I My Brother's Keeper?,* 5 N. Ky. L. Rev. 27, 41 n. 77 (1978); Note, *Hospital Corporate Liability: An Effective Solution to Controlling Private Physician Incompetence,* 32 Rutgers L. Rev. 342, 369 n. 194 (1979).

In addition to requiring the above information, the application provided that significant misstatements or omissions would be a cause for denial of appointment. Also, in the application, Salinsky authorized Misericordia to contact his malpractice carriers, past and present, and all the hospitals that he had previously been associated with, for the purpose of obtaining any information bearing on his professional competence, as well as his moral, and ethical qualifications for staff membership. The application also contained a consent form for the inspection of Salinsky's medical records at the hospitals that he was presently affiliated with, or had been in the past, and further provided that Salinsky released "from any liability any and all individuals and organizations who provide information to the hospital, or its medical staff, in good faith and without malice concerning my professional competence, ethics, character and other qualifications for staff appointment and clinical privileges."

Mrs. Jane Bekos, Misericordia's medical staff coordinator (appointed April of 1973), testifying from the hospital records, noted that Salinsky's appointment to the medical staff was recommended by the then hospital administrator, David A. Scott, Sr., on June 22, 1973. Salinsky's appointment and requested orthopedic privileges, according to the hospital records, were not marked approved until August 8, 1973. This approval of his appointment was endorsed by Salinsky himself. Such approval would, according to accepted medical administrative procedure, not be signed by the applicant but by the chief of the respective medical section. Additionally, the record establishes that Salinsky was elevated to the position of Chief of Staff shortly after he joined the medical staff. However, the court record and the hospital records are devoid of any information concerning the procedure utilized by the Misericordia authorities in ap-

proving either Salinsky's appointment to the staff with orthopedic privileges, or his elevation to the position of Chief of Staff.

Mrs. Bekos, testified that although her hospital administrative duties entailed obtaining all the information available regarding an applicant from the hospitals and doctors referred to in the application for medical staff privileges, she failed to contact any of the references in Salinsky's case. In her testimony she attempted to justify her failure to investigate Salinsky's application because she believed he had been a member of the medical staff prior to her employment in April of 1973,[9] even though his application was not marked approved until some four months later on August 8, 1973. Further, Mrs. Bekos stated that an examination of the Misericordia records reflected that at no time was an investigation made by anyone, of any of the statements recited in his application.

The record indicates that at the Misericordia medical staff meeting on June 21, 1973, Dr. A. Howell, the hospital's medical director, stated that the hospital did not have a functioning credentials committee at this time, and therefore the executive committee must assume the responsibility of evaluating and approving applications for medical staff privileges. Additionally, the minutes of this meeting list Salinsky as an attending member of the defendant's medical staff at the meeting despite the fact that Salinsky's application for staff privileges had neither been recommended for approval, nor approved by the committee as of this date. At trial, the only member of Misericordia's medical staff executive committee

[9] Mrs. Bekos' testimony that Salinsky was a member of Misericordia's medical staff before his application was approved on August 8, 1973, was corroborated by the hospital's records of a medical staff meeting on June 21, 1973, wherein Salinsky was listed as a member in attendance at the meeting.

to testify was Dr. Louis Maxey who stated that he did not recall ever being at any meeting where Salinsky's application was even considered.

Thus, besides raising a question as to when Salinsky was in fact appointed to Misericordia's medical staff, the testimony of Mrs. Bekos, and Dr. Maxey, together with the minutes of the defendant's medical staff meeting on June 21, 1973, clearly establishes that Misericordia did not investigate Salinsky's application before appointing him to its medical staff. Further, Walter Harden, Family Hospital's administrator, testified that no one from Misericordia, much less an executive committee member, contacted him in regard to Salinsky's statement in his application that he had orthopedic privileges at that institution. In fact, Misericordia concedes this point, stating "In this particular case, the defendant-appellant-petitioner hospital has admitted all along it did not check Dr. Salinsky's credentials. . . ."

At trial, the representatives of two Milwaukee hospitals, Arthur Schmidt, attorney for St. Anthony's Hospital, and Walter Harden, administrator of Family Hospital, together with Charles Taylor, administrative hospital consultant with the Wisconsin Department of Health (Bureau of Quality Compliance), gave testimony concerning the accepted procedure for evaluating applicants for medical staff privileges. Briefly, they stated that the hospital's governing body, *i.e.*, the board of directors or board of trustees, has the ultimate responsibility in granting or denying staff privileges. However, the governing board delegates the responsibility of evaluating the professional qualifications of an applicant for clinical privileges to the medical staff. The credentials committee (or committee of the whole) [10] conducts an

---

[10] The committee of the whole is a committee of the entire medical staff. It performs the function of a credentials committee in the absence of the same in hospitals with small medical staffs.

investigation of the applying physician's or surgeon's education, training, health, ethics and experience through contacts with his peers in the specialty in which he is seeking privileges, as well as the references listed in his application to determine the veracity of his statements and to solicit comments dealing with the applicant's credentials. Once the credentials committee (or committee of the whole) has conducted their investigation and reviewed all of the information bearing on the applicant's qualifications, it relays its judgment to the governing body, which, as noted, has the final appointing authority.

The record demonstrates that had the executive committee of Misericordia, in the absence of a current credentials committee, adhered to the standard and accepted practice of investigating a medical staff applicant's qualifications and thus examined Salinsky's degree, post graduate training, and contacted the hospitals referred to in his application, it would have found, contrary to his representations, that he had in fact experienced denial and restriction of his privileges, as well as never having been granted privileges at the very same hospitals he listed in his application. This information was readily available to Misericordia, and a review of Salinsky's associations with various Milwaukee orthopedic surgeons and hospital personnel would have revealed that they considered Salinsky's competence as an orthopedic surgeon *suspect*, and viewed it with a great deal of concern.

A short history of Salinsky's hospital contacts in the metropolitan Milwaukee area reflect that on December 19, 1947, Mt. Sinai Hospital granted Salinsky's request for privileges to perform simple orthopedic procedures[11]

---

[11] These "simple" orthopedic procedures were defined in a letter from the administrator of Mt. Sinai to Dr. Salinsky on August 31, 1949, as the treatment of superficial lacerations, amputation of digits, reparation of severed tendons in the hands and feet, re-

such as reducing simple fractures. A year and a half later, in August of 1949, Mt. Sinai denied Salinsky's request for additional orthopedic privileges and on December 30, 1963, transferred him to the rank of a courtesy physician in the Department of General Practice.[12]

As to Family Hospital, Salinsky was granted orthopedic surgical privileges on January 22, 1954. Some years later, in December of 1972, the executive committee of Family Hospital, after receiving a report of "continued flagrant bad practices" in the hospital on the part of Dr. Salinsky, recommended that his privileges for hip surgery be temporarily suspended. The hospital administrator then informed Salinsky that the executive committee had temporarily suspended his privileges, and advised him that the suspension would continue pending a review of his cases by a committee of three orthopedic surgeons. Pursuant to the recommendation of this committee the hospital withdrew Salinsky's privileges to perform any hip surgery, and further ordered that he obtain consultation before attempting *any* open surgical procedure. This limitation of Salinsky's surgical privileges at Family Hospital occurred on January 10, 1973, just two months prior to his application for staff privileges at Misericordia. Thus, this information also, was readily available to the Misericordia authorities if they had conducted a proper investigation.

On June 24, 1970, Salinsky applied for orthopedic surgical privileges at St. Anthony's Hospital. In his application, Salinsky stated that he was a member of the active staff at Doctors (now known as Family) Hospital.

---

duction of simple dislocations of the elbow joint and removal of exostosis of the toes.

[12] The Wisconsin Administrative Code defines the courtesy staff as those physicians ". . . who desire to attend patients in the hospital but who, for some reason not disqualifying, are ineligible for appointment in another category of the staff." Wis. Adm. Code sec. H 24.04(1)(g)4.

In the course of accepted investigative procedures of an applicant, the administrator of St. Anthony's Hospital contacted the administrator of Family Hospital, Walter Harden, and requested any and all medical information on Salinsky that might be helpful to the St. Anthony's credentials committee in reviewing and passing judgment on his application. Harden replied that Salinsky did have orthopedic surgical privileges at Family Hospital, although not certified in that specialty, and advised St. Anthony's Hospital to be careful and circumspect in their review of Salinsky's application. St. Anthony's subsequently denied Salinsky's application for orthopedic surgical privileges in January of 1971.

The testimony at trial established many other discrepancies in Salinsky's Misericordia application. The following testimony directly contradicted three of the representations made by Salinsky in his application to Misericordia. The administrators of both Northwest General Hospital and New Berlin Memorial Hospital testified that their records indicated Dr. Salinsky had *never been* associated with their hospitals. Also, Walter Harden, the administrator of Family Hospital where Dr. Salinsky had medical staff privileges from 1954 to 1973, testified that Salinsky was *neither board certified, nor board eligible* in the field of orthopedic surgery. This testimony contradicts the following language contained in the sentences preceding Salinsky's signature on his Misericordia application:

"I have not requested privileges for any procedures for which I am not certified. Furthermore, I realize that certification by a board does not necessarily qualify me to perform certain procedures. However, I believe that I am qualified to perform all procedures for which I have requested privileges."

Further, the record demonstrates that information having a bearing on Salinsky's qualifications as an ortho-

pedic surgeon was available from two other sources, namely, the Milwaukee Circuit Court files and Salinsky's peers. In regard to the former, the trial court took judicial notice of ten malpractice suits that had been filed against Salinsky in the Circuit Court for Milwaukee County, seven of which had been filed prior to the August 8, 1973 approval date of Salinsky's appointment as an orthopedic specialist on the Misericordia medical staff. Clearly, the questions dealing with the applicant's malpractice insurance carriers in Misericordia's application form were designed to facilitate the discovery of this type of information, and the only inference that can be drawn from Salinsky's failure to answer these questions is that he had something to hide and thus, Misericordia, in the proper exercise of care, should have been put on notice. With respect to the latter, Dr. Sam Neeseman, a clinical professor of orthopedic surgery at the Medical College of Wisconsin and a board certified orthopedic surgeon with surgical privileges at numerous Milwaukee area hospitals testified that he had conversed with a number of orthopedic surgeons in the Milwaukee area regarding Dr. Salinsky's credentials and stated that the vast majority of Dr. Salinsky's peers in the metropolitan Milwaukee area agreed that Salinsky was not a competent orthopedic surgeon.

Mr. Harden and Dr. Neeseman, both experienced with various medical staff credential committees in the Milwaukee area, opined that a hospital administrator or credentials committee, having investigated an applicant for orthopedic privileges and determined (1) that his privileges were confined to uncomplicated operative procedures at one hospital, and (2) that a committee of three orthopedic surgeons at another hospital had recommended that his orthopedic privileges be revoked, and (3) that such privileges were in fact revoked, a few months prior to the application under consideration,

would not have granted orthopedic surgical privileges to the applicant in the exercise of reasonable care. Further, the plaintiff also adduced expert testimony from these witnesses that a hospital authority, exercising ordinary care, would not have appointed Dr. Salinsky to its medical staff.

Drs. Salinsky and Maxey testified for the defense. Salinsky contradicted the testimony of the administrators of Northwest General Hospital and New Berlin Memorial Hospital, stating that he had consultant privileges with those hospitals. He also testified that he did not approve his own appointment to Misericordia's medical staff and attempted to explain away his signature in the approval section of his application, stating his signature appeared there "Because I was asked to sign the papers, and I signed the papers. . . ." Salinsky further stated that his appointment to Misericordia's medical staff was approved because other members of the staff recommended him.

Dr. Maxey, as noted above, was the only member of Misericordia's medical staff executive committee in 1973 to testify at the trial. Besides testifying that he could not recall ever having participated in the review of Salinsky's application, Maxey stated that he was familiar with Salinsky's ability as an orthopedic surgeon prior to the time Salinsky applied for staff privileges at Misericordia. Further, that he was of the opinion that Salinsky, in 1973, was a competent orthopedic surgeon, even though his own specialty (Maxey's) was in the field of plastic surgery. Maxey testified that the fact that other hospitals had denied, suspended, limited or revoked Salinsky's privileges would not influence his belief in this regard, stating:

". . . if I personally had contacted a hospital and the contact point such as an administrator had given me a negative opinion relative to Dr. Salinsky, or any doctor,

particularly a surgeon, I would have a great deal of reservations as to what the source of the criticism was in view of the medical hospital politics that exist today, and so it would not have swayed my opinion relative to his competency at all."

However, on cross examination, Maxey stated that he would be interested in reviewing what other hospitals had done relative to a particular applicant and further limited his endorsement of Salinsky when he stated that he "would have to defer to an orthopedic man's opinion relative to another orthopedic man with due consideration of the medical politics and economic controls that get into surgery."

The jury found that the hospital was negligent in granting orthopedic surgical privileges to Dr. Salinsky and thus apportioned eighty percent of the causal negligence to Misericordia. Damages were awarded in the sum of $315,000 for past and future personal injuries and $90,000 for past and future impairment of earning capacity. Judgment on the verdict was entered on May 7, 1979,[13] and Misericordia appealed to the court of appeals raising some thirty issues. The appellate court affirmed the decision of the trial court. We granted Misericordia's petition for review but limit our consideration to the following two issues.

*Issues*

1. Does a hospital owe a duty to its patients to use due care in the selection of its medical staff and the granting of specialized surgical (orthopedic) privileges?

2. What is the standard of care that a hospital must exercise in the discharge of this duty to its patients and did Misericordia fail to exercise that standard of care in this case?

---

[13] The judgment was for $333,429.39 or $405,000 plus costs and interest less a credit for twenty percent of the causal negligence attributed to Salinsky.

### Duty

At the outset, it must be noted that Dr. Salinsky was an independent contractor, not an employee of Misericordia, and that the plaintiff is not claiming that Misericordia is vicariously liable for the negligence of Dr. Salinsky under the theory of *respondeat superior*. Rather, Johnson's claim is premised on the alleged duty of care owed by the hospital directly to its patients.[14]

As stated in *Coffey v. Milwaukee,* 74 Wis.2d 526, 247 N.W.2d 132 (1976), "The concept of duty in Wisconsin, as it relates to negligence cases is irrevocably interwoven with foreseeability. Foreseeability is a fundamental element of negligence." (Citations omitted.) *Id.* at 537. In *A. E. Investment Corp. v. Link Builders, Inc.,* 62 Wis.2d 479, 214 N.W.2d 764 (1974) this court set the standard for determining when a duty arises:

*"A defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone.* A party is negligent when he commits an act when some harm to someone is foreseeable. Once negligence is established, the defendant is liable for unforeseeable consequences as well as foreseeable ones. In addition, he is liable to unforeseeable plaintiffs." (Emphasis supplied.) *Id.* at 484.

---

[14] The theory that a hospital owes a duty of care directly to its patients has been termed "corporate negligence" or "institutional responsibility." *See:* Spero, *Hospital Liability,* 15 Trial 22 (Sept., 1979); Copeland, *Hospital Responsibility for Basic Care Provided by Medical Staff Members: "Am I My Brother's Keeper?"* 5 N. Ky. L. Rev. 27 (1978); Lisko, *Hospital Liability Under Theories of Respondeat Superior and Corporate Negligence,* 47 U. Mo., Kansas City L. Rev. 171 (1978); Note, *Hospital Corporate Liability: An Effective Solution to Controlling Private Physician Incompetence,* 32 Rutgers L. Rev. 342 (1979); Note, *The Hospital's Responsibility for its Medical Staff: Prospects for Corporate Negligence in California,* 8 Pac. L. J. 141 (1977).

Further, we defined the term "duty" as it relates to the law of negligence:

"The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act." *Id.* at 483.

In addition, the harm that is foreseeable must create an unreasonable risk of danger. *Wilson v. Continental Ins. Cos.*, 87 Wis.2d 310, 318, 274 N.W.2d 679 (1979). Where the facts relating to the injury that allegedly give rise to a legal duty are not in dispute and, in this case the hospital-doctor-patient relationship, the question of the existence of a duty is a question of law for this court to decide. *See: Coffey v. Milwaukee, supra* at 531; *Schicker v. Leick,* 40 Wis.2d 295, 299–300, 162 N.W.2d 66 (1968).

Thus, the issue of whether Misericordia should be held to a duty of due care in the granting of medical staff privileges depends upon whether it is foreseeable that a hospital's failure to properly investigate and verify the accuracy of an applicant's statements dealing with his training, experience and qualifications as well as to weigh and pass judgment on the applicant would present an unreasonable risk of harm to its patients. The failure of a hospital to scrutinize the credentials of its medical staff applicants could foreseeably result in the appointment of unqualified physicians and surgeons to its staff. Thus, the granting of staff privileges to these doctors would undoubtedly create an unreasonable risk of harm or injury to their patients. Therefore, the failure to investigate a medical staff applicant's qualifications for the privileges requested gives rise to a foreseeable risk of unreasonable harm and we hold that a hospital has a duty to exercise due care in the selection of its medical staff.

Our holding herein is in accord with the public's perception of the modern day medical scientific research center with its computed axial tomography (CAT-scan), radio nucleide imaging thermography, microsurgery, etc., formerly known as a general hospital. The public is indeed entitled to expect quality care and treatment while a patient in our highly technical and medically computed hospital complexes. The concept that a hospital does not undertake to treat patients, does not undertake to act through its doctors and nurses, but only procures them to act solely upon their own responsibility, no longer reflects the fact. The complex manner of operation of the modern-day medical institution clearly demonstrates that they furnish far more than mere facilities for treatment. They appoint physicians and surgeons to their medical staffs, as well as regularly employing on a salary basis resident physicians and surgeons, nurses, administrative and manual workers and they charge patients for medical diagnosis, care, treatment and therapy, receiving payment for such services through privately financed medical insurance policies and government financed programs known as Medicare and Medicaid. Certainly, the person who avails himself of our modern "hospital facilities" (frequently a medical teaching institution) expects that the hospital staff will do all it reasonably can to cure him and does not anticipate that its nurses, doctors and other employees will be acting solely on their own responsibility.

Further, our holding is supported by the decisions of a number of courts from other jurisdictions. *See: Tucson Medical Center, Inc. v. Misevch,* 113 Ariz. 34, 545 P.2d 958 (1976); *Purcell v. Zimbelman,* 18 Ariz. App. 75, 500 P.2d 335 (1972); *Kitto v. Gilbert,* 39 Colo. App. 374, 570 P.2d 544, 550 (1977); *Mitchell County Hospital Authority v. Joiner,* 229 Ga. 140, 189 S.E.2d 412 (1972); *Darling v. Charleston Community Memorial Hospital,* 33

Ill.2d 326, 211 N.E.2d 253 (1965), *cert. den.*, 383 U.S. 946;[15] *Johnson v. St. Bernard Hospital,* 79 Ill. App.3d 709, 399 N.E.2d 198 (1979); *Ferguson v. Gonyaw,* 64 Mich. App. 685, 236 N.W.2d 543 (1976); *Bost v. Riley,* 44 N.C. App. 638, 262 S.E.2d 391 (1980); *Corleto v. Shore Memorial Hospital,* 138 N.J. Super. 302, 350 A.2d 534 (1975). *See also:* Annot., 51 ALR3d 981 (1973). These cases hold that a hospital has a direct and independent responsibility to its patients, over and above that of the physicians and surgeons practicing therein, to take reasonable steps to (1) insure that its medical staff is qualified for the privileges granted and/or (2) to evaluate the care provided.

One of the leading cases introducing the concept that a hospital, as an institution, has a responsibility for the quality of medical care provided by members of its medical staff was *Darling v. Charleston Community Memorial Hospital, supra.* In *Darling,* the plaintiff broke his leg in a college football game and was taken to the defendant hospital's emergency room where the doctor on emergency call applied traction and placed the leg in a plaster cast. Not long after the application of the cast, the plaintiff was in great pain and his toes, which protruded from the cast, became swollen and dark in color and eventually cold and insensitive. The same doctor who applied the cast removed it just three days later and cut the plaintiff's leg on both sides in the process. At this time, nurses and other witnesses observed "blood and other seepage" and smelled a foul odor in the room. Despite knowledge of these facts, the hospital failed to investigate or review the doctor's work nor require consultation. Eleven days thereafter, the plaintiff was transferred to another hospital under the care of an orthopedic surgeon who determined that the fractured leg contained

[15] Cf. *Collins v. Westlake Community Hospital,* 12 Ill. App.3d 847, 299 N.E.2d 326 (1973); *Lundahl v. Rockford Memorial Hospital Association,* 93 Ill. App.2d 461, 235 N.E.2d 671 (1968).

a considerable amount of dead tissue and opined that this resulted from a severe interference with the circulatory system in the limb, caused by the swelling or hemorrhaging of the leg against the cast. He made several attempts to try and save the leg but ultimately had to amputate it below the knee.

The court characterized the central issue as involving the duty that rested upon the defendant hospital in rendering care and treatment to the plaintiff. Accordingly, one of the issues considered on review was whether the hospital was negligent, in the fact situation recited in this case, in failing to:

". . . require consultation with or examination by members of the hospital surgical staff skilled in such treatment; or to review the treatment rendered to the plaintiff and to require consultants to be called in as needed." *Id.* 33 Ill.2d at 333, 211 N.E.2d at 258.

The court readily found that the hospital owed a duty to the plaintiff in this regard stating:

"The Standards for Hospital Accreditation, the state licensing regulations and the defendant's bylaws demonstrate that the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient." *Id.* 33 Ill.2d at 332, 211 N.E.2d 257.

Further, noting that there was no dispute that the hospital failed to review the doctor's treatment or require consultation after having been made aware that serious complications arose in the plaintiff's care and treatment, the court upheld the jury's verdict finding that the hospital was negligent in failing to review the doctor's work or require a consultation. Thus, the Illinois Supreme Court held that hospitals have a duty to monitor the quality of the practice of medicine and surgery that takes place within their facilities.

*Purcell v. Zimbelman, supra,* is another instructive case in this area of the law. In this case, the defendant surgeon, Dr. Purcell, initially diagnosed the plaintiff as suffering from either diverticulitis[16] or cancer and scheduled him for exploratory surgery to determine the exact nature of his affliction. During the course of this surgery, Purcell discovered a lesion on the plaintiff's rectosigmoid colon and called a pathologist to the operating room to examine and analyze the tissue. Although surgical standards required the surgeon to obtain a frozen section of the tissue encompassing the lesion, this was not done, and the pathologist observed the lesion and told Purcell that it "looked" like cancer. Relying on the pathologist's diagnosis, Purcell performed a cancer operation called a "Babcock-Bacon proctosigmoidectomy." As a result of the operation, the plaintiff suffered from a loss of sexual function, loss of a kidney, a permanent colostomy and urinary problems.

At trial, the expert medical testimony established that, given the location of the plaintiff's lesion, Purcell should have performed an anterior resection rather than a Babcock-Bacon proctosigmoidectomy. Further, the trial court admitted testimony concerning two patients who were treated by Purcell prior to the plaintiff at the defendant hospital. Purcell suspected that these patients were suffering from the same condition as the plaintiff, diverticulitis or cancer of the colon, and in neither case did Purcell perform an anterior resection. Both patients developed complications and both sued Purcell and the defendant hospital prior to Purcell's treatment of the plaintiff. In addition, two other patients of Dr. Purcell sued Purcell and the hospital for treatment they received in the hospital under Purcell's care. These suits were also commenced before Purcell treated the plaintiff.

[16] "Inflammation of the little sacs formed along the large intestine." *Id.* 18 Ariz. App. at 79, 500 P.2d n. 1 at 339.

The Arizona Appellate Court agreed with the plaintiff's theory that the hospital:

". . . had a duty to the public to allow the use of its facilities only by such independent staff doctors as are professionally competent and who treat their patients in full accordance with accepted and established medical practices, and that the hospital breached its duty when it failed to take any action against Purcell when it knew, or should have known, that he lacked the skill to treat the condition in question," *Id.* 18 Ariz. App. at 80, 500 P.2d 340,

and affirmed a jury verdict in his favor.

*Purcell* was approved by the Arizona Supreme Court in *Tucson Medical Center v. Misevch, supra,* wherein the court stated:

"Hospitals have been given and have accepted the duty of supervising the competence of the doctors on their staffs. *Purcell v. Zimbelman,* 18 Ariz. App. 75, 500 P.2d 335 (1972), *review denied; . . .* The concept of corporate responsibility for the quality of medical care was clearly enunciated in *Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 211 N.E.2d 253, 14 A.L.R.3d 860 (1965), when that court held that hospitals and their governing bodies may be held liable for injuries resulting from negligent supervision of members of their medical staffs. *Moore v. Board of Trustees of Carson-Tahoe Hospital,* 88 Nev. 207, 495 P.2d 605 (Nev. 1972). The hospital has assumed certain responsibilities for the care of its patients and it must meet the standards of responsibility commensurate with this trust. *Beeck v. Tucson General Hospital,* 18 Ariz. App. 165, 500 P.2d 1153 (1972), *review denied.* If the medical staff was negligent in the exercise of its duty of supervising its members or in failing to recommend action by the hospital's governing body prior to the case in issue, then the hospital would be negligent. *Purcell v. Zimbelman, supra." Id.* at 36.

Thus, Arizona also requires hospitals to take reasonable steps to give their patients assurance that the physicians and surgeons to whom they grant clinical priv-

ileges are licensed, well trained and qualified, both ethically and technically, to practice medicine and surgery in their facilities.

Of the noted cases, *Mitchell County Hospital Authority v. Joiner, supra,* and *Ferguson v. Gonyaw, supra,* are directly in point. In *Joiner,* the plaintiff's husband, complaining of chest pains, was taken to the defendant hospital where he was examined by a Dr. Gonzalez. Gonzalez advised him that his condition was not serious and that hospitalization was not required at this time. About 1½ hours later, his chest pains became more severe and he died en route, on his return trip to the hospital. The plaintiff's complaint against the hospital was similar to the complaint herein in that she alleged that the hospital was negligent in failing to require satisfactory proof of the professional qualifications of Dr. Gonzalez as a practicing physician; in failing to make any investigations into his qualifications, character or background; and in failing to exercise care in determining his professional competency and moral character.

The Georgia Appellate Court reversed a summary judgment in favor of the hospital, holding that the hospital had a duty to screen applicants for positions on its medical staff and the hospital cannot be said to have discharged this duty where the only inferences drawn from the affidavit in support of the motion for summary judgment were that the hospital's medical staff granted the requested privileges solely because the applicant was licensed by the state, and was recommended by members of the medical staff. The court intimated that the hospital would have to demonstrate that the recommendation from members of its medical staff came only after a reasonable investigation of Gonzalez' qualifications and credentials. It stated:

"The hospital must act *in good faith* and with *reasonable care* in the selection of a physician, and it has

fulfilled its obligation, and cannot be held liable when it 'selects an authorized physician in good standing in the profession.'

"...

"The mere fact that [the doctor] was a licensed physician of the State of Georgia recommended by other doctors on the staff as required by law does not overcome the averments that the hospital was negligent in failing to exercise care in determining his professional competency, should it later appear by evidence that the doctor was an incompetent or unskilled physician." *Joiner v. Mitchell County Hospital Authority,* 125 Ga. App. 1, 3, 186 S.E.2d 307, 308, 309 (1971).

The Georgia Supreme Court affirmed the appellate court, stating:

"... the plaintiff does not seek to hold the Hospital Authority liable under the doctrine of respondeat superior or principal and agent, but upon the doctrine of independent negligence in permitting the alleged negligent physician to practice his profession in the hospital, when his incompetency is known. Such negligence is comparable to that of the owner of a motor vehicle permitting an incompetent, inexperienced, or reckless driver to operate such motor vehicle. See *Vaughn v. Butler,* 103 Ga. App. 884, 121 S.E.2d 72. While in such cases the mere permission is insufficient to hold the owner liable without actionable negligence by the operator, yet each is held for his independent acts and not as master and servant or principal and agent."

"...

"... a Hospital Authority operating a public hospital has authority to examine the qualifications of any physician seeking staff privileges and to limit his practice to those areas in which he is deemed qualified to practice or to completely bar him from such practice if he is incompetent, unqualified, inexperienced or reckless.

"As pointed out by the decision of the Court of Appeals, the delegation of the Authority to screen applicants for staff membership on the medical staff does not relieve the Authority of its responsibility, since the members of such staff act as agents for the Authority,

and whether it knew or from the information in its possession the incompetency of the physician was known, is a question of fact. If the physician was incompetent and the Authority knew, or from information in its possession such incompetency was apparent, then it cannot be said that the Authority acted in good faith and with reasonable care in permitting the physician to become a member of its staff." *Mitchell County Hospital Authority v. Joiner,* 229 Ga. at 142.

Thus, it is clear that the Georgia Supreme Court has held that a hospital may be independently negligent and therefore liable for injury resulting from a failure to exercise reasonable care in its selection of a staff physician, and further that the hospital must investigate, review and pass judgment on the applicant's competency and cannot rely solely on the fact that he is a state licensed physician and has been recommended by other members of the medical staff.

In *Ferguson, supra,* the plaintiff was admitted to the defendant hospital under the care of Dr. Gonyaw, an osteopathic neurosurgeon. The plaintiff was suffering from a back injury at the time of admission to the hospital and his injury was apparently aggravated by the treatment received in the hospital at the hand of Gonyaw, as he alleged that Gonyaw failed to use the requisite standard of care in treating the same. He alleged that the hospital was negligent in granting staff privileges to Dr. Gonyaw claiming that a reasonable and prudent hospital would have determined that Gonyaw had inadequate training to be allowed to practice neurosurgery in its facilities. He established that the hospital had not verified the facts on Dr. Gonyaw's application for staff privileges and in fact they did not even follow normal procedures, *i.e.,* "[t]here were no letters in the file cross-checking his references or his past associations. Neither were there notations of telephone calls to his references or past associates as the administrator testified there

should have been if such telephone calls had been made."
*Id.* 64 Mich. App. at 697, 236 N.W.2d at 550. The Michigan Court of Appeals held that the hospital was negligent in this regard stating (p. 697) :

"One of the hospital's primary functions is to screen its staff of physicians to 'insure' that only competent physicians are allowed to practice in the hospital.
"    .    .    .
"Viewing the evidence in the light most favorable to the plaintiff,[17] it is clear that the hospital did not act as a reasonably prudent hospital in checking Dr. Gonyaw's qualifications to be a staff member at the hospital." (citations omitted). *Id.*[18]

At oral argument, the defendant conceded that other jurisdictions have recognized that hospitals owe a duty of care to their patients in selecting members of their medical staffs and granting various privileges.[19] However, Misericordia argues in their brief that this duty does not exist in Wisconsin because the Wisconsin Statutes and the Wisconsin Administrative Code (chapter on health) provide that a hospital retains the right to determine whether an applicant is qualified for medical staff privileges, and that a hospital has only a moral rather than a legal obligation to appoint only those doctors who are competent in their respective fields to its staff. Misericordia cites sec. 50.36(3), Stats., and sec. H 24.04(1)(d)1 of the Wisconsin Administrative Code as authority for this claim.

[17] The trial court granted a directed verdict in favor of the hospital and the standard of review was that the facts must be viewed in the light most favorable to the nonmoving party.

[18] The court, however, went on to hold that the hospital's negligence was not a cause of the plaintiff's injuries because a reasonable investigation would have revealed that the doctor was qualified and thus a hospital would not have denied him staff privileges.

[19] Defense counsel stated, "Other jurisdictions seem to indicate there is a duty and I go along with that."

Sec. 50.36 (3), Stats., provides: [20]

"Any person granted a license to practice medicine and surgery under ss. 448.05 and 448.06 shall be afforded an equal opportunity to obtain hospital staff privileges. No such person shall be denied hospital staff privileges solely for the reason that the person is an osteopathic physician and surgeon. *Each individual hospital shall retain the right to determine whether the applicant's training, experience and demonstrated competence is sufficient to justify the granting of medical staff privileges.*" (Emphasis supplied.)

Wis. Adm. Code sec. H 24.04 (1) (d) 1 states:

"(d) Staff appointments shall be made by the governing body, taking into account recommendations made by the active staff.
"1. The governing body shall have the legal right to appoint the medical staff and the moral obligation to appoint only those physicians who are judged by their fellows to be of good character and qualified and competent in their respective fields."

While it is true that the above-quoted statute and Administrative Code provision, when read together, provide that individual hospitals retain the right to determine whether an applicant is qualified for a position on its medical staff, and that hospitals (through their governing bodies) have a "moral obligation to appoint only those physicians [and surgeons] who are judged by their fellows [peers] to be of good character and qualified and competent in their respective fields," this statute and administrative rule in no way purport to negate the common law duty of care owed to patients by the hospital. Indeed, sec. 50.36 (3), Stats., implies the contrary in that it specifically states that the hospital must look to the applicant's "training, experience and demonstrated

---

[20] This provision was originally sec. 140.27 (2), Stats. 1973, but renumbered to its present decimal citation by ch. 413, Laws of 1975.

competence" in determining whether the applicant should be granted staff privileges. Moreover, the construction that Misericordia would have this court attribute to sec. 50.36(3), Stats., and Wis. Adm. Code, sec. H 24.04(1) (d)1, would emasculate the very legislative intent so evident in the enactment of sec. 50.36(3). This intent is expressed in sec. 50.34,[21] (enabling statute for Wis. Adm. Code, sec. H 24.04(1) (d)1,) as follows:

"The *purpose* of ss. 50.32 to 50.39 is to provide for the development, establishment and enforcement of rules and standards for the construction, maintenance and operation of hospitals which, in the light of advancing knowledge, *will promote safe and adequate care and treatment of patients in such hospitals.*" (Emphasis supplied.)

This court has stated on numerous occasions that a statute must be construed in light of its purpose. *See: Wisconsin's Environmental Decade v. Public Service Commission,* 84 Wis.2d 504, 518, 267 N.W.2d 609 (1978) ; *Student Ass'n. of the Univ. of Wis.-Milw. v. Baum,* 74 Wis.2d 283, 294–95, 246 N.W.2d 622 (1976).

Clearly, sec. 50.34, Stats., demonstrates that the legislature's concern in enacting the Hospital Regulation and Approval Act (secs. 50.32 to 50.39, Stats.,)[22] was for the improvement of patient care in hospitals. If we were to agree with the defendant's interpretation of sec. 50.36(3), Stats., it would relieve the hospitals of the responsibility to conduct a careful review of the credentials of the applicants for medical staff privileges, and thus impede the attainment of the optimal level of professional performance desired. Obviously, the promotion of quality care and treatment of patients requires hospitals to perform a thorough evaluation of medical staff

---

[21] Formerly sec. 140.25, Stats. 1973.
[22] Formerly secs. 140.23 to 140.29, Stats. 1973.

applicants from the standpoint of professional competence, ethics, established reputation, and further, to periodically review the qualifications of its staff through a peer review or medical audit mechanism. Hospitals, like doctors, must, above all else, be concerned with the welfare of their patients and must establish basic procedures to prevent subjecting them to harm and injury by physicians and surgeons who fail to possess an adequate level of technical skill, competence and ethical principles. Indeed, the Administrative Code requires as much.

Wis. Adm. Code, secs. H 24.02(1) and (1)(e) provides that the governing body shall be "legally responsible for the conduct of the hospital as an institution," and that the governing body has the ultimate responsibility for appointment of the medical staff. Administrative Code sec. H 24.04 governs medical staff appointments and, in addition to sec. 24.04(1)(d)1 quoted above, provides:

"H 24.04 Medical staff. (1) The hospital *shall* have a medical staff organized under bylaws approved by the governing body, *and responsible to the governing body of the hospital for the quality of all medical care provided patients in the hospital and for the ethical and professional practices of its members.*

" . . .

"(e) Members of the staff *shall be qualified legally, professionally,* and *ethically* for the positions to which they are appointed.

"1. To select its members and delineate privileges, the hospital medical staff *shall* have a system, based on definite workable standards, to evaluate each applicant by its credentials committee (or in small hospitals, committee-of-the-whole) which makes recommendations to the medical staff and to the governing body.

"2. Privileges *shall* be extended to duly licensed qualified physicians to practice in the appropriate fields of general practice, internal medicine, surgery, pediatrics, obstetrics, gynecology, and other recognized and accepted fields according to individual qualifications.

"3. Criteria for selection *shall* be individual character, competence, training, experience, and judgment.

"4. Under no circumstances shall the accordance of staff membership or professional privileges in the hospital be dependent solely upon certification, fellowship, or membership in a specialty body or society. All qualified candidates shall be considered by the credentials committee.

". . .

"(f) Regardless of any other categories having privileges in the hospital, there shall be an active staff, properly organized, which performs all the organizational duties pertaining to the medical staff. These include:

"1. *Maintenance of the proper quality of all medical care and treatment in the hospital.*" (Emphasis supplied.)

The interpretation of sec. 50.36(3), Stats., and Wis. Adm. Code, ch. H 24 that Misericordia suggests would allow hospitals to become lax in their review of applications for staff privileges and thus subject patients to an unwarranted risk of unskilled treatment by unqualified physicians and surgeons. We can conceive of no construction of sec. 50.36(3), and the Wis. Adm. Code sec. H 24.04(1)(d)1, that is more contrary to the purpose of promoting quality care and treatment of patients set forth in sec. 50.34, than that advanced by the petitioner. Moreover, Misericordia's construction of these provisions conflicts with the above-quoted portions of Wis. Adm. Code ch. H 24 which clearly and without qualification obligates hospitals to extend medical staff privileges to only those physicians who are qualified "legally, professionally and ethically." Thus, the defendant's reliance on sec. 50.36(3), and Wis. Adm. Code sec. H 24.04(1)(d)1, for the claim that Wisconsin hospitals do not owe a duty of care to their patients in the selection of their medical staff and the granting of staff privileges is without merit as it suggests a construction of sec. 50.36(3) that is opposed to the very purpose for which

this statute was enacted and stretches common sense and reason to ridiculous parameters. Therefore, having recognized that hospitals owe a duty of ordinary care in selecting and maintaining only qualified members on their medical staff to insure quality care, diagnosis and treatment of their patients, we hold that the trial court properly instructed the jury that "A hospital is under a duty to exercise reasonable care to permit only competent medical doctors the privilege of using their facilities."

*Standard*

The defendant's primary claim before this court is that the plaintiff failed to meet its burden of proving a breach of duty on the part of the hospital, *i.e.,* that Misericordia did not exercise reasonable care when granting orthopedic surgical privileges to Dr. Salinsky. Misericordia contends that the failure to exercise reasonable care when granting staff privileges can only be shown by proof that Dr. Salinsky was an incompetent orthopedic surgeon before it granted him privileges or before the operation on July 11, 1975, and that the hospital knew or should have known of his incompetency. Even if we were to hold proof of incompetency at the time a physician or surgeon applies for staff privileges to be the standard, there was sufficient testimony to establish that Salinsky used questionable orthopedic procedures as far back as 1973. Dr. Neeseman stated that he had personally reviewed some of Salinsky's cases and found that they "were not the work of a competent orthopedic surgeon." However, in this case, we do not adopt the legal theory that knowledge of incompetency is the standard for determining whether a hospital exercised due care in selecting its staff.

In *Peters v. Holiday Inns, Inc.,* 89 Wis.2d 115, 278 N.W.2d 208 (1979), this court, quoting from *Osborne v.*

*Montgomery,* 203 Wis. 223, 242–43, 234 N.W. 372 (1931) stated that once a duty is established, the standard of care to be exercised is defined as follows:

" '. . . the degree of care which the great mass of mankind ordinarily exercises under the same or similar circumstances. A person fails to exercise ordinary care when, without intending to do any wrong, he does an act or omits a precaution under circumstances in which a person of ordinary intelligence and prudence ought reasonably to foresee that such act or omission will subject him or his property, or the person or property of another to an unreasonable risk of injury or damage.' " *Peters v. Holiday Inns, Inc., supra* at 122–23.

The standard of "ordinary care under the circumstances" applies to hospitals. In *Payne v. Milwaukee Sanatarium Foundation, Inc.,* 81 Wis.2d 264, 272, 260 N.W.2d 386 (1977), this court held, "The duty of care owed a patient by a hospital in this state is one of ordinary care under the circumstances." *See also: Schuster v. St. Vincent Hospital,* 45 Wis.2d 135, 172 N.W.2d 421 (1969). Stated differently, for a hospital to be liable ". . . it must have failed to exercise that standard of care usually exercised in similar situations by other members of the medical profession and thus breached that legal duty owed to the patient." *Mossey v. St. Luke's Hospital,* 63 Wis.2d 715, 720–21, 218 N.W.2d 514 (1974). Thus, for Misericordia to be liable for negligence in this case, it must have failed to exercise that degree of care and skill required of a hospital under like or similar circumstances. *See: Shier v. Freedman,* 58 Wis.2d 269, 206 N.W.2d 166, 208 N.W.2d 328 (1973) (rejecting the "locality" rule in medical malpractice actions).

The resolution of the issue of whether the hospital was negligent in granting Salinsky orthopedic surgical privileges and appointing him to its medical staff de-

pends on whether Misericordia exercised that degree of care and skill as the average hospital exercises in selecting its medical staff. Applying this standard to the facts of this case, Johnson was only required to show that the defendant did not exercise reasonable care (that degree of care ordinarily exercised by the average hospital) to determine whether Salinsky was competent. Thus, the defendant's claim that the plaintiff had the burden of showing that Salinsky was actually incompetent and that the hospital knew or should have known of his incompetence before granting him surgical privileges or before the July 11, 1975 operation is in error, as we hold that Johnson *was only obliged to prove that Misericordia did not make a reasonable effort to determine whether Salinsky was qualified to perform orthopedic surgery.* Therefore, the trial court's instruction that the hospital was required to exercise reasonable care in the granting of medical staff privileges and that reasonable care "meant that degree of care, skill and judgment usually exercised under like or similar circumstances by the average hospital," was proper.

Turning to the plaintiff's proof requirements, since the procedures ordinarily employed by hospitals in evaluating applications for staff privileges are not within the realm of the ordinary experience of mankind, we agree with the ruling of the appellate court that expert testimony was required to prove the same.[23] As we stated in *Payne v. Milwaukee Sanatarium Foundation, Inc., supra:*

"In establishing the negligence of a hospital the necessity for expert testimony depends upon the type of negligent acts involved. Expert testimony should be adduced concerning those matters involving special knowledge, skill or experience on subjects which are not within the

[23] *See: Johnson v. Misericordia Community Hospital, supra,* n. 1 at 555.

ordinary experience of mankind and which require special learning, study or experience." *Id.* at 275–76.

There was an abundance of expert testimony in this case delineating the procedures used in various hospitals to verify a physician's representations and references when making application for staff privileges. The plaintiff's experts on hospital administration, Walter Harden and Charles Taylor, uniformly testified that this procedure involves contacting the applicant's past associates, *i.e.,* hospitals and doctors, to check the veracity of his representations and to solicit their opinion of his qualifications for the privileges requested. Dr. Sam Neeseman testified that the four hospitals that granted staff privileges to him required, at a minimum, proof that he: (1) graduated from an accredited medical school; (2) completed his internship; (3) completed his orthopedic surgical training; and (4) was board certified in orthopedic surgery. Indeed, Mrs. Jane Bekos, medical staff coordinator for Misericordia from April of 1973 through January or February of 1977, testified the defendant usually followed this procedure, but that it was not adhered to in Dr. Salinsky's case.

Since the defendant hospital admits that it did not conduct an investigation of Salinsky's credentials, and this failure to act created an unreasonable risk of harm, its actual or constructive knowledge of Dr. Salinsky's qualifications for privileges certainly is a key factor in determining whether the hospital exercised reasonable care. *See: Fiorentino v. Wenger,* 19 N.Y.2d 407, 227 N.E. 2d 296 (1967).[24] As the Arizona Supreme Court stated in *Tucson Medical Center, Inc. v. Misevch, supra:*

---

[24] The New York Court of Appeals stated:

"Where a hospital's alleged misconduct involves an omission to act, the hospital will not be held responsible unless it has reason to know that it should have acted within the duty it concededly had." (Citations omitted.) *Fiorentino, supra,* at 19 N.Y.2d 414, 227 N.E.2d at 299.

"When the hospital's alleged negligence is predicated on an omission to act, the hospital will not be held responsible unless it had reason to know that it should have acted within its duty to the patient to see to it that only professionally competent persons were on its staff. . . . Therefore, its knowledge, actual or constructive, is an essential factor in determining whether or not the hospital exercised reasonable care or was guilty of negligence.' (Citations omitted.) *Id.* 113 Ariz. at 36, 545 P.2d at 960.

In this case, there was no evidence presented to the jury indicating that Misericordia had actual knowledge that Salinsky was not qualified to perform the hip surgery in question. Thus, the question becomes whether the defendant could be charged with constructive knowledge of Salinsky's poor reputation as an orthopedic surgeon in the community.

Constructive knowledge, as noted by the appellate court[25] is that knowledge that one can acquire in the exercise of ordinary care. *Attoe v. State Farm Auto Ins. Co.*, 36 Wis.2d 539, 546, 153 N.W. 575 (1967). This court, in *Zdunek v. Thomas,* 215 Wis. 11, 15, 254 N.W. 382 (1934) discussed constructive knowledge as follows:

"It is a general rule of law sustained by the authority of many cases that whatever fairly puts a person on inquiry with respect to an existing fact is sufficient notice of that fact if the means of knowledge are at hand. If under such circumstances one omits to inquire, he is then chargeable with all the facts which, by proper inquiry, he might have ascertained. *Melms v. Pabst Brewing Co.*, 93 Wis. 153, 165, 66 N.W. 518, 20 R.C.L. p. 346, §7, and cases cited.

"The matter of knowledge or means of knowledge is dealt with in the Restatement of the Law of Contracts, sec. 180, comment f:

" 'A person has "reason to know" a fact when he has such information as would lead a person exercising rea-

[25] *See: Johnson v. Misericordia Community Hospital, supra,* n. 1, at 557–58.

sonable care to acquire knowledge of the fact in question or to infer its existence.'

"If a person confronted with a state of facts closes his eyes in order that he may not see that which would be visible and therefore known to him if he looked, he is chargeable with 'knowledge' of what he would have seen had he looked. A person by closing his eyes for the purposes of preventing knowledge by that act brings himself within the field of knowledge as that term is used in the law. Therefore the trial court correctly held that if the defendant desisted from inquiry for the reason that she suspected that a situation existed which she did not wish to be aware of, she brought herself within the field of knowledge as to those matters which a reasonably careful inquiry would have disclosed."

The expert testimony in this case of Walter Harden and Charles Taylor clearly demonstrates that the average hospital in the exercise of ordinary care would have investigated the credentials of an applicant for staff privileges by contacting the hospitals referred to in his application. Thus, the record beyond all doubt demonstrates that under the doctrine of constructive knowledge, Misericordia at a minimum, was charged with having knowledge of that information which could readily have been obtained if only its personnel had contacted and communicated with the hospitals referred to in Salinsky's application.

The facts adduced at trial establish that had Misericordia sought information from the hospitals referred to in Salinsky's application, it would have discovered: (1) that Doctors Hospital revoked Salinsky's orthopedic privileges and required that he obtain consultation before attempting any open surgical procedure *just two months before he applied* for orthopedic privileges at Misericordia; (2) that he had been *denied staff privileges* at St. Anthony's Hospital in January of 1971; (3) that he was *never on the consulting staff of New Berlin*

*Memorial Hospital or Northwest General Hospital;* (4) that Mt. Sinai Hospital granted him privileges to perform simple orthopedic procedures[26] but later reduced his rank to courtesy physician in the Department of General Practice and ultimately revoked all of his privileges for failure to use their clinical departments; and (5) that Walter Harden, the administrator of Family Hospital where Salinsky possessed orthopedic privileges from January of 1954 to January of 1973, testified that Salinsky was neither board eligible nor board certified in orthopedics. Further, Dr. Neeseman testified that in 1973 the majority of Salinsky's peers (orthopedic surgeons in the Milwaukee metropolitan area) were of the opinion that Salinsky ". . . was not qualified [as an orthopedic surgeon] by virtue of training or by virtue of demonstration." Additionally, Misericordia had access to the Milwaukee Circuit Court files wherein it would have discovered that seven malpractice suits had been filed against Salinsky. Given that Misericordia with due diligence must be charged with the knowledge of the foregoing facts before it appointed Salinsky to its medical staff, the dispositive issue is whether a hospital with knowledge of such facts would, in the exercise of ordinary care, have granted Salinsky orthopedic surgical privileges.

There was credible evidence to the effect that a hospital, exercising ordinary care, would not have appointed Salinsky to its medical staff. Mr. Harden, administrator for Family Hospital, testified a hospital governing board with knowledge that an applicant for medical staff privileges had his orthopedic surgical privileges revoked at one hospital, on the recommendation of a panel of three orthopedic surgeons, and that his orthopedic privileges at another hospital were confined to simple operative procedures, would not, on the basis of

---

[26] *See:* n. 11, *supra* at p. 716.

this information, have granted him surgical privileges in that specialty. Dr. Sam Neeseman stated that a hospital's credentials committee, with knowledge of such events would not, in the exercise of ordinary care, have approved the applicant's request for orthopedic privileges.

This court has held ". . . a jury's finding of negligence . . . will not be set aside when there is any credible evidence that under any reasonable view supports the verdict. . . ." (citations omitted). *Schuster v. St. Vincent Hospital, supra,* at 144. Thus, the jury's finding of negligence on the part of Misericordia must be upheld as the testimony of Mr. Harden and Dr. Neeseman constituted credible evidence which reasonably supports this finding.

In summary, we hold that a hospital owes a duty to its patients to exercise reasonable care in the selection of its medical staff and in granting specialized privileges. The final appointing authority resides in the hospital's governing body,[27] although it must rely on the medical staff and in particular the credentials committee (or committee of the whole) to investigate and evaluate an applicant's qualifications for the requested privileges.[28] However, this delegation of the responsibility to investigate and evaluate the professional competence of applicants for clinical privileges does not relieve the governing body of its duty to appoint only qualified physicians and surgeons to its medical staff and periodically monitor and review their competency.[29] The cre-

---

[27] Wis. Adm. Code secs. H 24.02(1)(a), 24.04(1) and 24.04(1)(d). *See also:* the Joint Commission on Accreditation of Hospital standards in the American Hospital Association Manual, pp. 54–56 (hereinafter referred to as AHA Manual).

[28] Wis. Adm. Code, secs. H 24.04(1)(d) and 24.04(1)(k); AHA Manual, pp. 55–56.

[29] Wis. Adm. Code secs. H 24.02(1), 24.02(1)(e) and 24.04(1)(d).

dentials committee (or committee of the whole) must investigate the qualifications of applicants. The facts of this case demonstrate that a hospital should, at a minimum, require completion of the application and verify the accuracy of the applicant's statements, especially in regard to his medical education, training and experience.[30] Additionally, it should: (1) solicit information from the applicant's peers, including those not referenced in his application, who are knowledgeable about his education, training, experience, health, competence and ethical character; (2) determine if the applicant is currently licensed to practice in this state and if his licensure or registration has been or is currently being challenged; and (3) inquire whether the applicant has been involved in any adverse malpractice action and whether he has experienced a loss of medical organization membership or medical privileges or membership at any other hospital.[31] The investigating committee must also evaluate the information gained through its inquiries and make a reasonable judgment as to the approval or denial of each application for staff privileges. The hospital will be charged with gaining and evaluating the knowledge that would have been acquired had it exercised ordinary care in investigating its medical staff applicants and the hospital's failure to exercise that degree of care, skill and judgment that is exercised by the average hospital in approving an applicant's request for privileges is negligence. This is not to say that hospitals are *insurers* of the competence of their medical staff, for a hospital will not be negligent if it exercises the noted standard of care in selecting its staff.

*By the Court.*—The decision of the Court of Appeals is affirmed.

---

[30] *See:* AHA Manual, p. 94, suggesting that the application form require this information.

[31] *Id.*