Estate of Michael Becker, by its Special Administrator, Nancy G. Becker, Plaintiffs-Appellants,

v.

Julie Olson, and Allstate Insurance Company, Defendants-Respondents.

Court of Appeals

*No. 97–0641. Submitted on briefs February 6, 1998.—Decided March 25, 1998.*

(Also reported in 579 N.W.2d 810.)

12

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Phillip R. Godin* and

*Roberta N. Buratti* of *Godin & Geraghty, S.C.* of Kenosha.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Michael J. Hicks* of *Hills & Hicks, S.C.* of Brookfield.

Before Brown, Nettesheim and Anderson, JJ.

BROWN, J.    In 1993, Arturo Perez shot and killed Michael Becker with a sawed-off shotgun during a confrontation on the front lawn of Julie Olson's home. The Estate of Michael Becker, by its Special Administrator, Nancy G. Becker (the Estate), subsequently brought suit against Olson. The Estate argued that Olson, as the owner of the house, had a duty to exercise ordinary care and that she breached her duty by permitting Perez, whom she knew to be violent, to keep a sawed-off shotgun in her home. A jury agreed. But during postverdict motions, Olson argued that she had no duty to intervene and protect Becker from the hazardous situation he voluntarily entered into. The trial court cited recent Wisconsin case law saying that a host or hostess has no duty to affirmatively intervene when one guest assaults another as controlling the result in this case and overturned the jury finding.

We affirm the trial court's decision but on different grounds. The issue in this case was not whether Olson had a duty to affirmatively intervene to protect Becker. The Estate never argued that Olson had such a duty and concedes that she did not. But the Estate did contend that Olson breached her common law duty to exercise ordinary care and created an unreasonable risk of danger when she permitted a violent person, Perez, to keep a sawed-off shotgun in her house. We therefore disagree with the trial court about whether

this case had to do with the duty of affirmative intervention. We conclude that a duty arose on Olson's part long before the confrontation took place and, as to that duty, the jury had credible evidence to conclude that she breached it. However, because the link between Olson's negligence and Becker's death is too attenuated, we decline to impose liability for public policy reasons.

Olson, her two children and her boyfriend, Perez, lived together in a home owned by Olson. Domestic violence was a recurring problem in the relationship, and Olson testified that although she had never seen Perez fight or act violently towards other people, he "was violent towards [her] in the past." Olson also allowed Perez to store a sawed-off shotgun in the bedroom closet of her home. At no time did she ask Perez to remove the weapon from her home.

On the evening of September 18, 1993, Olson and Perez held a party at the Olson home. James and Annette Stuart, who were friends of Olson and Perez, attended the party. At the same time, Becker and some of his friends were socializing at several taverns in the area. Becker and his friends did not know Olson, Perez or their friends.

At about two o'clock in the morning on September 19, Becker and a friend, James Willems, were standing next to Willems' truck which was parked outside of a tavern located approximately one and a half blocks from Olson's home. Annette and Olson, who had decided to take a walk around the block, passed by Becker and Willems. When Annette and Olson returned to Olson's home, Annette told her husband, James, that Becker and Willems had made sexual comments to her.

15

James, who was on the porch of Olson's home with Perez, then began to yell profanities at Becker and Willems, who were still standing next to Willems' truck. Becker and Willems then approached the Olson residence, and Perez went inside the house. Becker, Willems and James then had a short verbal confrontation, and afterwards, James went inside the house as Becker and Willems left Olson's property. Willems then got into his truck, while Becker started to walk back to the tavern. Willems testified that as he started to drive away, however, Perez ran up to the truck and hit it twice with "what appeared to be a BB gun." Willems then returned to the tavern to tell his friends about what happened and bring them back to the Olson residence.

Becker, Willems and two other men then returned to the Olson residence. As they walked onto Olson's property, Perez and James came out of the house. After a short verbal confrontation, Perez brandished a shotgun and shot Becker in the armpit as he turned to run away. Becker died a short time later. All of the parties involved had consumed varying amounts of alcohol prior to the shooting.

From the start of the first confrontation, Olson remained inside the house. Although Olson did watch Perez go into the bedroom and retrieve the shotgun, she did not ask Perez to put the shotgun away nor did she call the police. When Becker and his friends returned to Olson's house, Olson left the house, got into her car and then drove away after hearing a gunshot.

The Estate subsequently brought suit against Olson and her insurer, Allstate Insurance Company. Following a trial, the jury determined that Olson was negligent. Olson then filed a motion after verdict asking the court to dismiss the claims against her. The

trial court found that under *Zelco v. Integrity Mutual Insurance Co., 190 Wis. 2d 74, 527 N.W.2d 357 (Ct. App. 1994), Olson did not owe Becker a duty to protect him from Perez and it granted Olson's motion. The court then dismissed the claims against Olson and entered judgment in her favor. The Estate appeals.

For a plaintiff to maintain a cause of action for negligence, the defendant must owe a duty of care. *See Coffey v. City of Milwaukee,* 74 Wis. 2d 526, 531, 247 N.W.2d 132, 135 (1976). Whether a duty exists is a question of law which we review independently of the trial court. *See id.*

Olson argues that under *Zelco,* she owed Becker no duty of care to protect him from Perez. In *Zelco,* a guest at a party was injured after he voluntarily confronted another guest. The injured guest then sued the host of the party, contending that the host should have intervened and protected him from the other guest. *See Zelco,* 190 Wis. 2d at 78, 527 N.W.2d at 358.

The court disagreed, holding that although a social host or hostess does have a duty to exercise ordinary care toward individuals who come into a home with consent, a host does not have a duty to protect a guest who voluntarily confronts another guest. *See id.* at 78–79, 527 N.W.2d at 358–59. The law does not impose a duty upon persons to take affirmative action to protect or aid someone from hazardous situations. *See id.* at 79, 527 N.W.2d at 359. Only when a special relationship exists, noted the court, does the law impose a duty upon a person to protect an individual from another's conduct. *See id.* The court held that there is no recognized social host/guest association which is a special relationship; therefore, the social host in the case before it did not have a duty to protect the guest when

17

that guest confronted another guest at the party. *See id.*

*Zelco,* therefore, stands for the proposition that a social host does not have to take affirmative steps to protect a guest who voluntarily confronts another guest. Thus, it speaks of duty in the affirmative sense—an affirmative obligation imposed by law to do a specific thing; and it reflects the common law's reluctance to impose affirmative obligations upon others. *See Walker v. Bignell,* 100 Wis. 2d 256, 263, 301 N.W.2d 447, 452 (1981). But the Estate readily concedes that Olson did not have a duty to take affirmative steps to intervene in the confrontation and prevent Perez from shooting Becker. Instead, the Estate speaks of duty in a different sense: The common law duty to exercise ordinary care towards all persons. The Estate argues that Olson created an unreasonable risk of harm to others when she allowed Perez, whom she knew to be violent, to keep a sawed-off shotgun in her house; and thus, she violated her common law duty to exercise ordinary care.

██ "Everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others." *Palsgraf v. Long Island R. Co.,* 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting). Wisconsin case law has adopted the *Palsgraf* viewpoint, stating:

> The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act . . . .

*Rockweit v. Senecal,* 197 Wis. 2d 409, 419–20, 541 N.W.2d 742, 747 (1995) (quoted source omitted). Therefore, the essence of the common law duty to exercise ordinary care is not to do, or refrain from doing, a particular act, "but rather to act in a particular way—to exercise reasonable care—whenever it is foreseeable that one's conduct may cause harm to another."[1] *Walker,* 100 Wis. 2d at 263, 301 N.W.2d at 452.

Olson's argument that she had no duty to protect Becker during the confrontation, therefore, fails to address the issue of whether she exercised ordinary care when she allowed Perez, a person she knew to be violent, to store a sawed-off shotgun in her house. Thus, this is not a *Zelco* case and Olson's reliance on it is misplaced. We conclude that Olson did owe Becker a common law duty—the duty to exercise ordinary care.

We now turn to the question of whether Olson breached her common law duty to exercise ordinary care. Negligence is determined by ascertaining whether the defendant's exercise of care foreseeably created an unreasonable risk of harm to others. *See Rockweit,* 197 Wis. 2d at 423, 541 N.W.2d at 749. "The risk need not be to the particular plaintiff. The test [in Wisconsin] is whether unreasonable risk to the world

---

[1] Some cases, such as *Walker v. Bignell,* 100 Wis. 2d 256, 263–64, 301 N.W.2d 447, 452 (1981), refer to the duty as the duty to exercise reasonable care, while others, such as *Rockweit v. Senecal,* 197 Wis. 2d 409, 423, 541 N.W.2d 742, 749 (1995), refer to the duty as the duty to exercise ordinary care. Although these cases use different terms to describe the duty—ordinary care versus reasonable care—the duty of care imposed by law is in fact the same; the difference in terminology is of no consequence to the legal analysis.

at large is created by the conduct." *Id.* (quoted source omitted). The duty of ordinary care is therefore not limited to those persons who might be expected to be injured by the actor's conduct, but to all those who are in fact injured. Whether a defendant's actions were negligent is a question of mixed law and fact ordinarily left to the jury. *See id.*

Negligence consists of failing to use that degree of ordinary care which would be exercised by "the great mass of mankind" under the same or similar circumstances. *See* WIS J I—CIVIL 1005. "A person fails to exercise ordinary care when, without intending to do any wrong, he does an act or omits a precaution under circumstances in which a person of ordinary intelligence and prudence ought reasonably to foresee that such act or omission will subject him or his property, or the person or property of another, to an unreasonable risk of injury or damage." *Rockweit,* 197 Wis. 2d at 424, 541 N.W.2d at 749 (quoted source omitted); *see also* WIS J I—CIVIL 1005. A jury's finding of negligence will be upheld if there is any credible evidence which, under any reasonable view, supports the verdict. *See Johnson v. Misericordia Community Hosp.,* 99 Wis. 2d 708, 744, 301 N.W.2d 156, 174 (1981). Credible evidence is evidence which "when reasonably viewed, fairly admits an inference supporting the jury's findings." *Leatherman v. Garza,* 39 Wis. 2d 378, 386, 159 N.W.2d 18, 23 (1968) (quoted source omitted).

The jury found that Olson breached her duty of ordinary care towards Becker, determining that her actions were a cause in the shooting death of Becker. This conclusion is supported by credible evidence in the record. Olson testified that she allowed Perez to keep a

sawed-off shotgun in the bedroom closet. Also, she testified that Perez had a history of engaging in violent acts and that he had abused her on several occasions. Moreover, a firearms expert testified that the shotgun, because of the modifications to the barrel and stock, had no purpose other than as a weapon for self-defense "or to shoot someone with because the barrel has been cut off."

From this testimony, a jury could conclude that when Olson allowed Perez, a violent person, to keep a sawed-off shotgun in her house, she foreseeably created an unreasonable risk of harm to others. The jury could further conclude that Olson's failure to insist that Perez remove the sawed-off shotgun from her home, thus giving Perez easy access to a deadly weapon, was a cause of Becker's death.

However, this does not end our analysis. Our supreme court has stated: "[O]nce it is determined that a negligent act has been committed and that the act is a substantial factor in causing the harm, the question of duty is irrelevant and a finding of nonliability can be made only in terms of public policy." *Schuster v. Altenberg,* 144 Wis. 2d 223, 235, 424 N.W.2d 159, 164 (1988) (quoted source omitted). Although some cases have held that the actor had no "duty" to the injured party, the determination to deny liability is essentially one of public policy rather than of duty or causation. *See Rockweit,* 197 Wis. 2d at 425, 541 N.W.2d at 750. Whether liability should be imposed in a given situation is a question of law. *See id.* at 425, 541 N.W.2d at 749.

The supreme court has provided a number of factors to consider in determining whether to deny liability on the grounds of public policy:

> (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Walker,* 100 Wis. 2d at 265, 301 N.W.2d at 453 (quoted source omitted; citations omitted).

In the case at bar, Becker was not a guest at Olson's party and Olson did not give Becker permission to enter her property. Instead, Becker was on Olson's property as a result of his voluntary decision to return to the Olson residence and confront James and Perez. Also, it is clear that the confrontation was between Becker, Becker's friends, Perez and James, and that Olson did not play any role in the dispute between these parties; she did not initiate the confrontation, tell Perez to get the shotgun or otherwise participate in the dispute. Olson's role was that of an observer who watched the tragedy unfold from her living room window.

The act upon which Olson's liability rests is her decision at some point prior to the shooting to allow Perez to keep a sawed-off shotgun in her home. She knew Perez had a history of violence, and the jury found that this act was negligent.

As the list of public policy factors reflect, however, we trace the consequences of one's negligent act, not indefinitely, but to a certain point. *See Palsgraf,* 162 N.E. at 105 (Andrews, J., dissenting). Here, a multi-

tude of other events occurred between Olson's decision to let Perez keep a gun in her house and Becker's death, none of which were under Olson's control. It was Annette who decided to tell James that Becker and his friend had made sexual comments to her, a statement which Olson later heard Annette admit was false. James then decided to yell profanities at the two men, thereby starting the confrontation. Rather than walking away and returning to their business, Becker and Willems opted to confront James and Perez. Even though the men quickly left, Perez apparently decided to continue the confrontation and hit Willems' truck. Becker, Willems and their friends then resolved to return to the Olson residence so that they could again confront James and Perez. Perez alone made the decision to escalate the conflict and arm himself with a deadly weapon. He also decided to use the weapon to shoot Becker.

Given these circumstances, it is obvious that many factors independent of Olson's negligence contributed to the initiation and escalation of the confrontation between the parties. Because of the multitude of intervening causes, we cannot say that there was a direct connection between Olson's negligence and Becker's death. In the parlance of tort law, we cannot say that Olson's negligence was the proximate cause of Becker's death. Becker's death was too remote from Olson's negligence; and because the link between cause and effect was so attenuated, in retrospect, it appears too highly extraordinary that her negligence would have brought about the harm. The attenuated link between cause and effect also makes Olson's culpability wholly out of proportion to Becker's injury.

Another factor which strikes us as especially relevant here is whether "allowance of recovery would place too unreasonable a burden on the negligent tortfeasor." *Walker*, 100 Wis. 2d at 265, 301 N.W.2d at 453 (quoted source omitted). It is uncontradicted in the record that Perez physically abused Olson. Given these circumstances, we think it is highly unreasonable to expect Olson to have put herself at risk by ordering Perez to remove the weapon from her home. Abusive relationships have, at their core, an element of fear on the part of the abused partner concerning the abuser. Fear is part of the reason why the abuser is able to intimidate and control the abused person. We conclude, therefore, that allowance of recovery would place too unreasonable a burden on Olson.

We could continue to list public policy reasons for not imposing liability, such as the attenuated link between cause and effect would impose too unreasonable a burden on Olson, or that we see no sensible or just stopping point if we allow recovery, but this would only serve to place more legal boilerplate on the rationale of our decision. The point is that Olson's negligence was not a substantial factor in producing Becker's death because the multitude of other factors independent of her act that gave rise to and then escalated the confrontation make the link between Olson's negligence and Becker's death too attenuated. In the final analysis, the decision to impose liability is a question of fair judgment given the circumstances of the case. We must draw a line between liability and nonliability, and we draw it as best we can. Based on the foregoing analysis, we decline to impose liability on Olson for Becker's death.[2]

---

[2] Olson also argues that the trial court erred because it excluded character evidence, including prior bad acts of Perez,

*By the Court.*—Judgment affirmed.

showing Olson's knowledge of Perez's propensity for violence. Because we decline to impose liability on Olson, this issue is moot and we will not address it further. *See State ex rel. Wis. Envtl. Decade v. Joint Comm.,* 73 Wis. 2d 234, 236, 243 N.W.2d 497, 498 (1976).