COURT OF APPEALS
DECISION
DATED AND FILED

November 3, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP2188**

Cir. Ct. No. **2019CV284**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

KERI ANNE CONNAUGHTY AND KEVIN CONNAUGHTY,

    PLAINTIFFS-APPELLANTS,

  V.

TRANSFORMATIONS SURGERY CENTER, INC.
AND CONTINENTAL CASUALTY COMPANY,

    DEFENDANTS-RESPONDENTS.

       APPEAL from an order of the circuit court for Dane County: FRANK D. REMINGTON, Judge. *Affirmed in part; reversed in part and cause remanded for further proceedings.*

       Before Kloppenburg, Graham, and Nashold, JJ.

    ¶1    KLOPPENBURG, J. Keri Anne Connaughty and Kevin Connaughty sued Transformations Surgery Center, Inc. for "[n]egligent hiring

and/or negligent granting of practicing privileges" ("negligent credentialing") of Dr. John W. Siebert; the Connaughtys also sued Siebert for allegedly violating Keri Anne's informed consent regarding breast augmentation surgery.[1] The Connaughtys alleged that Transformations negligently credentialed Siebert based on his history of misconduct and disciplinary actions in New York, and that this negligence resulted in Siebert's violation of Keri Anne's informed consent.

¶2 The circuit court granted Transformations' motion for summary judgment and dismissed the Connaughtys' negligent credentialing claim. Crediting the Connaughtys' version of disputed facts for purposes of summary judgment, the court determined that the connection between Siebert's misconduct and his violation of Keri Anne's informed consent is "too attenuated" to sustain the negligent credentialing claim. Separately, the court also denied the Connaughtys' motion to amend their witness list. The Connaughtys challenge both decisions on appeal.

---

[1] For ease of reading we refer to Keri Anne and Kevin Connaughty as the Connaughtys, to Keri Anne Connaughty as Keri Anne, to Transformations Surgery Center, Inc. as Transformations, and to Dr. John W. Siebert as Siebert.

The Connaughtys used the phrase "Negligent Hiring and/or Negligent Granting of Practicing Privileges" in their initial complaint and all subsequent amendments. However, in their appellate briefing the Connaughtys refer to their claim as "negligent credentialing", and Transformations in its appellate briefing also uses the term "negligent credentialing." In addition, the circuit court here and Wisconsin appellate courts generally use the term "credential" and the process of "credentialing" to refer to the granting of practice privileges related to medical staffing decisions. *See, e.g.*, ***Johnson v. Misericordia Cmty. Hosp.***, 99 Wis. 2d 708, 723, 301 N.W.2d 156 (1981) ("The failure of a hospital to scrutinize the credentials of its medical staff applicants could foreseeably result in the appointment of unqualified physicians and surgeons to its staff.") Accordingly, we will refer to the Connaughtys' claim as "negligent credentialing" consistent with Wisconsin case law and the parties' submissions.

The Connaughtys sued both Transformations and Siebert for additional claims not pertinent to this appeal. The operative complaint that contains the allegations to which we refer in this opinion is the Connaughtys' third amended complaint.

2

¶3      First, the Connaughtys argue that Transformations is not entitled to summary judgment because it is reasonably foreseeable that Siebert would violate a patient's informed consent based on his ethical misconduct that Transformations negligently failed to investigate when credentialing him. Transformations argues that it is entitled to summary judgment dismissing the Connaughtys' negligent credentialing claim because Siebert's misconduct is "too attenuated" from his violation of Keri Anne's informed consent. Crediting the Connaughtys' version of the facts, as both Transformations and the circuit court did for purposes of summary judgment, we conclude that Transformations fails to show as a matter of law that Siebert's misconduct is "too attenuated" from his violation of Keri Anne's informed consent. That is, on those facts, Transformation fails to show that it is not reasonably foreseeable from Siebert's ethical misconduct that he would cause injury to Keri Anne by violating her informed consent. Therefore, Transformations is not entitled to summary judgment.

¶4      Second, the Connaughtys argue that the circuit court erroneously denied their motion to amend their witness list in response to Transformations' brief supporting its summary judgment motion. We conclude that the circuit court did not erroneously exercise its discretion in denying the Connaughtys' motion to amend their witness list. Therefore, we affirm in part, reverse in part, and remand to the circuit court for further proceedings.

## BACKGROUND

¶5      The circuit court "accepted" the following facts for purposes of summary judgment, and Transformations does not challenge those facts for purposes of summary judgment.

¶6    Transformations maintains bylaws that establish the procedures that comprise the credentialing process for the initial "appointment" and bi-annual "re-appointment" of medical staff members. During this credentialing process, a doctor consents to a broad investigation into the doctor's background. Transformations' bylaws provide for the investigation of the doctor for behavior related to patient safety, ethics, compliance with the law, and compliance with any of Transformations' bylaws, policies, and regulations. These bylaws empower Transformations to pursue an investigation regardless of whether the relevant conduct takes place "inside or outside" Transformations' facility. Once appointed by Transformations, the bylaws require that the doctor conduct the doctor's professional practice in an ethical fashion and in accordance with federal and state law and codes of ethics, including, but not limited to, the American Medical Association's code of ethics.

¶7    Siebert applied for initial appointment with Transformations in 2007. After Siebert was appointed, Siebert's credentialing application was reviewed every two years by Transformations' medical director prior to Siebert's re-appointment. Reports compiled by the National Practitioner Data Bank ("NPDB") documenting misconduct by Siebert were part of his credentialing applications and were reviewed by Transformations' medical director every time Siebert submitted a credentialing application for reappointment.

¶8    The NPDB reports that Transformations received starting in 2012 and in Siebert's subsequent reappointment credentialing applications identified that, pertinent here, when practicing in New York Siebert was sanctioned by the State of New York Department of Health for having a sexual relationship with a patient, was investigated for allegations made by another patient, and lost practicing privileges with multiple medical institutions. Siebert provided

Transformations with a May 2013 New York Department of Health Office of Professional Medical Conduct consent order which he signed to resolve the department's charges relating to the sexual relationship. Transformations did not further investigate the New York misconduct identified in the NPDB reports or the consent order when it reappointed Siebert pursuant to the credentialing process prior to Keri Anne's surgery.

¶9     In Siebert's licensing documents submitted to the State of Wisconsin in 2010, 2012, 2014, and 2016, Siebert misrepresented the status of his license in New York.

¶10     Records from a 2013-15 Wisconsin Department of Safety and Professional Standards investigation into certain of the New York incidents establish that Siebert falsified a post-operative report regarding one of those incidents. Transformations did not review those records when it reappointed Siebert pursuant to the credentialing process prior to Keri Anne's surgery.

¶11     In February 2018 Siebert performed surgery, including a bilateral breast augmentation, on Keri Anne in the course of his practice at Transformations. Before the surgery, Keri Anne selected breast implants that were 225 to 250 cubic centimeters, but Siebert inserted breast implants that were 350 to 375 cubic centimeters.

¶12     In February 2019, the Connaughtys filed this action alleging, among other claims, that Siebert violated Keri Anne's informed consent by inserting different sized implants from those she selected and that Transformations negligently credentialed Siebert.

¶13    Transformations moved for summary judgment dismissing the negligent credentialing claim, arguing that the Connaughtys' version of the facts fails to show a "causal nexus" between Transformations' credentialing of Siebert and Keri Anne's injury from Siebert's violation of her informed consent. The circuit court granted the motion based on its determination that Siebert's prior misconduct is "too attenuated" from and "dissimilar" to ignoring a patient's informed consent.

¶14    Separately, in the course of the parties' briefing on the summary judgment motion, the circuit court denied the Connaughtys' motion to amend their witness list by adding three witnesses connected to a medical malpractice action against Siebert concerning a procedure in New York.

¶15    The Connaughtys appeal the summary judgment order and the denial of their motion to amend their witness list.

## DISCUSSION

### I. Negligent Credentialing Claim

¶16    "Whether the circuit court properly granted summary judgment is a question of law that this court reviews de novo." **Schmidt v. Northern States Power Co.**, 2007 WI 136, ¶24, 305 Wis. 2d 538, 742 N.W.2d 294. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2019-20).[2] This court

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

views the summary judgment materials "in the light most favorable to the party opposing summary judgment[.]" *United Concrete & Const., Inc. v. Red-D-Mix Concrete, Inc.*, 2013 WI 72, ¶12, 349 Wis. 2d 587, 836 N.W.2d 807.

## A. Applicable Legal Principles

¶17    We analyze the Connaughtys' negligent credentialing claim based on general principles of negligence. *See Johnson v. Misericordia Cmty. Hosp.*, 99 Wis. 2d 708, 722-737, 301 N.W.2d 156 (1981) (applying general principles of negligence to a negligent credentialing claim). Generally, a plaintiff alleging negligence in Wisconsin must prove four elements: "(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Coffey v. City of Milwaukee*, 74 Wis. 2d 526, 531, 247 N.W.2d 132 (1976). However, even when a claim meets all the requisite elements of negligence, a court may in addition address whether "as a matter of law, [] considerations of public policy require dismissal of the claim." *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 654, 517 N.W.2d 432 (1994).

¶18    Both the elements of negligence and the public policy considerations include a causation component. *Sanem v. Home Ins. Co.*, 119 Wis. 2d 530, 537-38, 350 N.W.2d 89 (1984); *Morgan v. Pennsylvania General Ins.*, 87 Wis. 2d 723, 735, 275 N.W.2d 660 (1979). Together, these two components constitute "legal cause." *Id.* As our supreme court clarified over forty years ago, "legal cause" in negligence actions is made up of two components: (1) cause-in-fact, which is the third element of a negligence claim and is generally a factual question for the jury; and (2) public policy considerations, which were formerly referred to as "proximate cause" and which present legal questions for the court. *Id.*; *see also*

*Mackenzie Fandrey v. American Family Mut. Ins. Co.*, 2004 WI 62, ¶¶10-12, ¶13 n.7, 272 Wis. 2d 46, 680 N.W.2d 345 (noting that legal cause consists of cause-in-fact and public policy considerations, and that, as to the latter, Wisconsin has "largely" jettisoned the formerly used term "proximate cause"), and ¶45 ("in Wisconsin, we use public policy factors, not proximate cause") (Bradley, A.W., concurring). The parties are at times imprecise in their use of terminology relating to causation in negligence actions. Accordingly, we now clarify the definitions of these terms and the distinctions among them.

¶19 As stated, one of the two components of legal cause is the third element of a negligence claim, which requires that a plaintiff prove "a causal connection between the conduct and the injury." *Coffey*, 74 Wis. 2d at 531. This element is referred to as "cause-in-fact." *Morgan*, 87 Wis. 2d at 735. "The test of cause-in-fact is whether the negligence was a "substantial factor" in producing the injury." *Id.* "[T]here can be more than one substantial factor contributing to the same result and thus more than one cause-in-fact." *Id.*

¶20 In negligent credentialing claims relating to the appointment of medical staff, the cause-in-fact element comprises two parts: (1) proving that the doctor's negligent act was a cause-in-fact of the patient's injury; and (2) proving that the negligent credentialing by the appointing facility (such as a hospital or clinic) was a cause-in-fact of the negligent act of the doctor. *Johnson*, 99 Wis. 2d at 711. Thus, a plaintiff alleging negligent credentialing must prove negligence on the part of the doctor and negligence on the part of the body that credentialed the doctor. *Id.* This means that a plaintiff must show a duty on the part of the doctor, a breach of that duty, and that the breach was a substantial factor in producing the injury, in addition to showing a duty on the part of the hospital, a breach of that

duty, and that the hospital's breach was a substantial factor in producing the doctor's negligence.

¶21    This two-part test is identical to that established for claims of negligent hiring, training, or supervision of an employee. *Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 261-62, 580 N.W.2d 233 (1998).  In that case, the court stated, "the causal question is whether the failure of the employer to exercise due care was a cause-in-fact of the wrongful act of the employee that in turn caused the plaintiff's injury." *Id.*  The court explained that this means that:

> there must be a nexus between the negligent hiring, training, or supervision and the act of the employee.  This requires two questions with respect to causation.  The first is whether the wrongful act of the employee was a cause-in-fact of the plaintiff's injury.  The second question is whether the negligence of the employer was a cause-in-fact of the wrongful act of the employee.

*Id.*  Thus, "causal nexus," which is one of the terms used by the parties in their briefing, is simply a term for the cause-in-fact element of negligence defined above.

¶22    The other component of legal cause comprises "considerations of public policy." *Morgan*, 87 Wis. 2d at 737 ("public policy considerations are an element of legal cause, though not a part of the determination of cause-in-fact"); *Fandrey*, 272 Wis. 2d 46, ¶¶12-13, 15.  The public policy considerations require a court to determine whether any of the following six factors exist, so as to prelude liability:

> (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the

> negligent tortfeasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Morgan*, at 737. Any one of these public policy factors may be invoked to limit liability. *See, e.g.*, *Kidd v. Allaway*, 338 Wis. 2d 129, 143, 807 N.W.2d 700 (2011) (precluding liability under the second public policy factor). A court may consider the public policy factors "to assure that 'in cases so extreme that it would shock the conscience of society to impose liability, the courts may step in and hold as a matter of law that there is no liability.'" *Fandrey*, 272 Wis. 2d 46, ¶15 (quoting *Pfeifer v. Standard Gateway Theater*, 262 Wis. 229, 238, 55 N.W.2d 29 (1952)).

¶23 Here, the public policy factors on which the parties have focused and on which the circuit court relied relate to the concept of foreseeability or attenuation, that is, whether it is reasonably foreseeable that the alleged negligence would cause the alleged injury or, stated conversely, whether the injury is so unreasonably attenuated such that liability should not be imposed. *See Ramharter v. Madison Newspapers, Inc.*, 2002 WI App 34, ¶11, 250 Wis. 2d 353, 639 N.W.2d 801 ("The inquiry is whether the negligence would ordinarily and predictably result in the injuries that occurred in this case …. [T]he for[e]seeability of the harm resulting from the negligence, … was the core of the third factor, also was an element in the first, second, and sixth factors.").

¶24 To recap, a causal connection or nexus is synonymous with cause-in-fact and involves the substantial factor test, whereas public policy considerations involve a six-factor analysis to determine whether liability should be precluded regardless of the existence of cause-in-fact. Both cause-in-fact and public policy considerations comprise the legal cause necessary to sustain a negligence claim.

10

While negligence actions require legal cause simply because legal cause refers to these two essential, but distinct, components of causation in negligence actions (cause-in-fact and public policy considerations), legal cause is not its own independent element or test in negligence separate from cause-in-fact or public policy considerations. It is crucial to keep these terms for the two different components of legal cause separate because, not only do they require different tests, but they are also treated differently by the courts. *Morgan*, 87 Wis. 2d at 737. Cause-in-fact is a question for the jury. *Id.*; *Fandrey*, 272 Wis. 2d 46, ¶12. Consideration of the public policy factors is a legal question "solely" for the court. *Morgan*, 87 Wis. 2d at 737; *Fandrey*, 272 Wis. 2d 46, ¶12 (quoting *Sanem v. Home Ins Co.*, 119 Wis. 2d 530, 537038, 350 N.W.2d 89 (1984)).

¶25 Finally, although a court "may grant summary judgment on public policy grounds before a trial," it is generally better practice to "submit negligence and cause-in-fact issues to the jury before addressing" the public policy factors. *Bowen*, 183 Wis. 2d at 654 (citing *Padilla v. Bydalek*, 56 Wis. 2d 772, 779-80, 203 N.W.2d 15 (1973); *Pfeifer*, 262 Wis. at 240). In particular, the factual connections in a given case may appear to be so "attenuated" that a full trial should precede a court's consideration of the public policy factors. *Bowen*, 183 Wis. 2d at 655 ("[W]hen the issues are complex or the factual connections attenuated, it may be desirable for a full trial to precede the court's determination [of the public policy considerations]."); *Coffey*, 74 Wis. 2d at 543 ("The factual connections are so attenuated that a full trial should precede this court's determination of the policy considerations."). We understand the court in *Bowen* and *Coffey* to mean that, as the factual issues in a case increase in complexity, it becomes more difficult to ascertain *the degree of attenuation* present in the absence of a trial. Under these circumstances, a court may be unable to determine

whether the degree of attenuation is so great as to render the foreseeability of the injury unreasonable, consequently necessitating a trial.

## B. Analysis

¶26 Here, Transformations appears to presume that, crediting the Connaughtys' version of the facts for purposes of summary judgment, the elements of a negligence claim are met (i.e., that Transformations negligently credentialed Siebert, that Siebert violated Keri Anne's informed consent, that there is a causal connection between the two acts, and that Keri Anne suffered injury as a result).[3] More specifically, with respect to causation, Transformations does not develop an argument that, crediting the Connaughtys' version of the facts for purposes of summary judgment, the Connaughtys have failed to prove the cause-in-fact element of their negligent credentialing claim. Rather, Transformations argues that it is entitled to summary judgment dismissing that claim as a matter of public policy because "the causal connection to [Keri Anne's] injury [is] too attenuated." We now explain why we conclude that, crediting the Connaughtys' version of the facts at this summary judgment stage of the proceedings, Transformations fails to establish as a matter of law that it is not reasonably foreseeable, from Transformations' negligent credentialing based on its failure to investigate Siebert's misconduct in New York, that Siebert would violate Keri Anne's informed consent.

---

[3] Separate from its summary judgment motion, Transformations maintains that many of the facts pertinent to the elements of a negligence claim are disputed. We do not address those disputes in this opinion. Nothing in this opinion addresses the ultimate admissibility of the evidence presented by the parties on summary judgment, or precludes the parties from pursuing factual disputes in further proceedings in the circuit court.

¶27 The Connaughtys point to facts including that Siebert had a sexual relationship with a patient, falsified a report of an operation, and misrepresented his past misconduct on various occasions. The Connaughtys argue that these instances of unethical and dishonest conduct could reasonably make it foreseeable that he would ignore a patient's informed consent.

¶28 Transformations asserts in a conclusory manner that there is no relationship between Siebert's past misconduct and his violation of Keri Anne's informed consent. Transformations argues that ethical considerations are not relevant to a doctor's handling of informed consent and that nothing in Siebert's past misconduct shows a "propensity" for ignoring a patient's informed consent. Accordingly, Transformations argues, the connection between the two is "too attenuated to sustain the [negligent credentialing] claim."

¶29 We reject Transformations' arguments on this topic as unsupported by the facts credited as true for purposes of summary judgment. It cannot be said as a matter of law that is not reasonably foreseeable, based on those facts, that the injury to Keri Anne from the violation of her informed consent would follow from the credentialing of a doctor with the record of unethical and dishonest conduct that exists here. Transformations' bylaws mandate, as part of its credentialing process, investigations of all records pertinent to the doctor's "ethical qualifications," and Siebert's ethical misconduct here could reasonably bear on his truthfulness and ethical character in handling a patient's informed consent. Similarly, the bylaws also require that doctors be honest with their patients, and Transformations' medical director testified that a doctor's dishonesty could result in harmful consequences to patients.

13

¶30    We conclude that Transformations fails to show as a matter of law that the record of a doctor's past unethical and dishonest conduct of the kinds described here has "too attenuated" a connection to whether the doctor would violate a patient's informed consent.  More specifically, the connection between Siebert's past ethical misconduct and his violation of Keri Anne's informed consent is not so unreasonably attenuated as to render his violation of her informed consent unforeseeable.  Accordingly, the Connaughtys' negligent credentialing claim was erroneously dismissed on summary judgment.

¶31    We stress that our conclusion is based on consideration of the Connaughtys' version of the facts, which was credited by Transformations and the circuit court for purposes of summary judgment.  However, as noted above, it is apparent from the parties' briefing that, outside of summary judgment, many of the facts and the admissibility of the evidence from which the facts are taken are strenuously disputed.  The factual complexity of this case supports our conclusion reversing dismissal on summary judgment of the Connaughtys' negligent credentialing claim based on the public policy factors related to foreseeability and attenuation.  Indeed, this presents as the kind of factually complex case that warrants a full trial, after which the circuit court may address the public policy factors based on the facts found by the jury.  *See **Bowen***, 183 Wis. 2d at 653-54.

¶32    The complex nature of the facts in this case also distinguishes it from the unpublished authored opinion cited by the circuit court in its summary judgment decision.  In that opinion, this court reviewed the dismissal on summary judgment of a claim of negligent hiring against Big Brothers and Big Sisters of Metropolitan Milwaukee for hiring as a volunteer a person who subsequently

sexually assaulted the plaintiff. ***Doe v. Foley***, No. 2019AP667, unpublished slip op. (WI App Aug. 18, 2020).[4]  This court affirmed because none of the evidence comprising the volunteer's "prior convictions for financial crimes and operating while intoxicated" reflected that the volunteer had "a propensity" to commit a sexual crime. ***Id.*** at ¶8.  Here, however, Transformations fails to show as a matter of law that the credited facts of Siebert's past unethical and dishonest conduct do not reasonably reflect "a propensity" for (i.e., are not "too attenuated" from) handling Keri Anne's informed consent in an unethical and dishonest manner so as to ignore her informed consent.

¶33    Transformations appears to argue that we should only look to technical competence, and not ethical concerns, when determining whether there is causation.  However, Transformations cites no legal authority to support such a proposition, and the law is to the contrary.  In ***Johnson***, 99 Wis. 2d at 734-35, the court makes numerous references to the ethical principles that are at stake in credentialing medical professionals.  For example, the court states that "[a hospital] should [] solicit information from the applicant's peers, including those not referenced in his application, who are knowledgeable about his [or her] education, training, experience, health, competence and *ethical character*." ***Id.*** at 745 (emphasis added).  The court also states, "[o]bviously, the promotion of quality care and treatment of patients requires hospitals to perform a thorough evaluation of medical staff applicants from the standpoint of professional competence, *ethics*, established reputation, and further, to periodically review the qualifications of its staff." ***Id.*** at 734-35 (emphasis added).

---

[4] *See* WIS. STAT. RULE 809.23(3)(b) (permitting the citation of authored, unpublished opinions issued after July 1, 2009, for their persuasive value).

¶34   As to the responsibility of hospitals in credentialing doctors, the court states, "[h]ospitals, like doctors, must, above all else, be concerned with the welfare of their patients and must establish basic procedures to prevent subjecting them to harm and injury by physicians and surgeons who fail to possess an adequate level of technical skill, competence and ethical principles." *Id.* at 735. As to the duties imposed by the Wisconsin legislature, the court states that the applicable regulations "clearly and without qualification obligate[] hospitals to extend medical staff privileges to only those physicians who are qualified 'legally, professionally and ethically.'" *Id.* at 736. In commenting on the law in another jurisdiction, the court notes, "Arizona also requires hospitals to take reasonable steps to give their patients assurance that the physicians and surgeons to whom they grant clinical privileges are licensed, well trained and qualified, both ethically and technically to practice medicine and surgery in their facilities." *Id.* at 728-29.

¶35   In sum, Transformations fails to show that injury resulting from a doctor's violation of a patient's informed consent may not as a matter of law be reasonably foreseeable when a hospital or clinic credentials the doctor whose past conduct demonstrates ethical lapses, not only technical incompetence.

## II. Amendment to Witness List

¶36   We review a circuit court's decision on whether to allow an amendment to a witness list under an erroneous exercise of discretion standard. *State v. James*, 2005 WI App 188, ¶8, 285 Wis. 2d 783, 703 N.W.2d 727. A court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law and, using a rational process, reaches a conclusion that a reasonable judge could reach. *Loy v. Bunderson*, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982).

¶37    The Connaughtys filed a motion to add three witnesses to their witness list in response to Transformations' reliance in its summary judgment motion on deposition testimony of an attorney who investigated Siebert for the State of Wisconsin Department of Safety and Professional Services. The three witnesses were a former patient of Siebert's who filed a medical malpractice lawsuit against him concerning a procedure in New York, the patient's attorney representing her in the medical malpractice suit, and the patient's dermatologist who had communications with Siebert regarding the procedure at the center of the medical malpractice suit. The circuit court denied the Connaughtys' motion at the conclusion of a hearing on the motion, after the Connaughtys presented offers of proof as to the proposed testimony of each of the three witnesses and the parties presented their arguments.

¶38    We conclude that the record shows that the circuit court properly exercised its discretion. The court considered whether, consistent with the scheduling order, the Connaughtys showed good cause for amending it. The court determined that they failed to show good cause based on the following considerations. The court found that the Connaughtys' motion was filed eleven months after the scheduling order's deadline for the submission of witness lists, and long after the Connaughtys were aware of the additional witnesses based on their own expert's opinion. The court noted that the scheduling order had already been amended multiple times and that, at the time of this latest proposed amendment, it was "way too close to trial to be adding witnesses." The court explained that adding the witnesses so close to trial "would be severely prejudicial to the defense" by introducing unproven allegations as to a procedure in New York, resulting in the potential introduction of improper other acts evidence and "a trial within a trial" as to whether Siebert was negligent in the New York matter.

17

The court also noted that the Connaughtys' expert could reference the documents and records, including those from the New York licensing department and the Wisconsin Department of Safety and Professional Services, regarding what happened in New York as providing the factual basis for his opinion that Transformations should have further investigated the matter.

¶39    The Connaughtys argue that, in denying their motion, the circuit court erroneously forbid them from calling rebuttal witnesses whose testimony they assert "was necessary to show" that the Wisconsin Department of Safety and Professional Services attorney wrongly concluded that Seibert did not cause "serious harm" to the New York patient.  To the contrary, the court expressly stated that it would decide whether to allow the parties to call rebuttal witnesses after the parties presented their evidence at trial.  We are not persuaded by the Connaughtys' attempt to conflate the court's decision on a motion to amend a witness list contrary to a scheduling order with a decision on rebuttal witnesses, given the record summarized above.

## CONCLUSION

¶40    For the reasons stated, we conclude that the circuit court erroneously granted Transformations' motion for summary judgment on the Connaughtys' negligent credentialing claim, and properly exercised its discretion in denying the Connaughtys' motion to amend their witness list.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded for further proceedings.

Not recommended for publication in the official reports.